IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

TRAVIS DUVALL,                          )
                                        )
            Plaintiff,                  )
                                        )
v.                                      ) Case No. CIV-07-315-KEW
                                        )
GEORGIA-PACIFIC CONSUMER                )
PRODUCTS, L.P., a foreign               )
limited partnership, f/k/a              )
Georgia-Pacific Corporation,            )
                                        )
            Defendant.                  )

## OPINION AND ORDER

This matter comes before the Court on Defendant's Motion for Summary Judgment filed August 1, 2008 (Docket Entry #42). Having had a timely response and reply filed to it, the Motion is at issue. Upon review and consideration of these documents, this Court renders this ruling.

Plaintiff Travis Duvall ("Duvall") was employed by Defendant Georgia-Pacific Consumer Products, L.P. ("Georgia-Pacific") beginning in May of 1999. Georgia-Pacific operates a facility in Muskogee, Oklahoma, manufacturing tissue, towel, and other paper products. As a paper mill, paper dust is present "wherever you go within the mill" in varying degrees.

One exception to the environment of dust was the shipping department within the facility. Prior to 2006, Georgia-Pacific operated a shipping department at the facility which loaded and shipped product to customers throughout the country. The shipping department generally had less paper dust than the manufacturing

departments because the product in the shipping department was already fully produced and packaged. However, the shipping department could be a dusty and dirty environment as well due to its proximity to the manufacturing departments and the fact doors from shipping opened to the docks. The shipping department also had significant fumes from forklifts and other machinery used to move and load products.

When hired in May of 1999, Duvall worked as a general laborer in the shipping department. He suffered from cystic fibrosis since the age of two. Georgia-Pacific was aware of Duvall's diagnosis of cystic fibrosis throughout his employment. Duvall's condition affected his ability to work in dusty environments. Duvall experienced difficulty breathing in dusty conditions.

While employed in the shipping department, Duvall received raises until he eventually was making over $19.00 per hour by the Fall of 2005.

However, in the Fall of 2005, Georgia-Pacific decided to outsource the remaining shipping functions and eliminate Georgia-Pacific jobs in the shipping department. The shipping jobs would initially be transferred to Encadria Staffing Solutions' ("Encadria") temporary employees and then to NLS which would operate a company within Georgia-Pacific in the shipping department. The only remaining positions for Georgia-Pacific employees in the shipping department would be that of a palletizer.

The completion of the outsourcing process was scheduled for June 30, 2006.

Georgia-Pacific coordinated attrition in other departments and increased the need for employees in the converting department so that employees in the shipping department could remain employed by bidding into jobs in other departments.

During the Fall of 2005, shipping department employees were informed that the department was to be outsourced and that they should begin bidding into jobs of their choosing as the jobs became available in the facility. Employees were told employment in other departments would be based upon seniority. Georgia-Pacific established a bidding procedure that allowed shipping department employees to maintain their seniority and bid for multiple positions at once to encourage them to find other positions with the facility. Employees were warned that those who did not bid into another position by the time their jobs were eliminated could be placed into open positions within the facility.

During late 2005 and early 2006, a majority of the shipping department employees bid into other jobs within the facility. Those employees who wished to remain in the shipping department bid into the palletizer positions. As a result, those receiving palletizer positions had approximately 20 years seniority with Georgia-Pacific which constituted more seniority than that held by Duvall. By the Spring of 2006, Duvall was one of the employees who

3

did not receive a palletizer job but remained in the shipping department.

Also by the Spring of 2006, the only open position available to Duvall based upon his seniority was in the converting department. In early February of 2006 after unsuccessfully bidding on a palletizer position, Duvall submitted a transfer request form making himself available for a transfer to the converting department and began working in the converting department in late February of 2006. As a result of his changing positions, Duvall's pay was increased to over $21.00 per hour.

Duvall was asked to complete a respirator questionnaire in anticipation of moving to other positions in the facility. Based upon Duvall's responses to the questionnaire regarding his cystic fibrosis, Stephanie Bryant, the company nurse for Georgia-Pacific, submitted Duvall for a pulmonary function test. Based upon the results of the test, Nurse Bryant and a company physician approved Duvall to wear a dust mask.

Duvall expressed concern to Nurse Bryant about working in converting because of the presence of paper dust. On April 24, 2006, Duvall reported to Nurse Bryant that he was having difficulty breathing in converting. Duvall was sent to the company physician, Dr. Murff Box. Dr. Box indicated Duvall could return to work to alternative duties, but should have no exposure to paper dust. Dr. Box also advised Duvall to see his treating pulmonologist.

After Duvall received medical restrictions from Dr. Box, Georgia-Pacific convened a Company Response Team ("CRT"). The CRT is a group of individuals within Georgia-Pacific which reviews medical restrictions and collects data related to possible accommodations for the individual employee with restrictions. The CRT then makes recommendations to management regarding accommodations.

The CRT assembled to address Duvall's restrictions consisted of Nurse Bryant, Stan McLemore, Safety Manager, and Duvall's supervisors in the converting department to review Duvall's restrictions and determine the accommodations which could be made for Duvall. At the time the CRT convened, Duvall was scheduled to work another two days before taking seven days off as part of his normal shift schedule. For the two days remaining, the CRT decided Duvall could return to the shipping department since he had not been "episodic" there to permit time for Duvall to see his pulmonologist.

The CRT gave Duvall an Job Requirement/Essential Functions form for his physician to complete to determine whether Duvall could perform the essential functions of his position in the converting department. On May 4, 2006, Duvall with the form partially completed. The form is not included in the record on summary judgment. Based upon Duvall's deposition testimony, however, the form was completed to a degree by Dr. Kramer, Duvall's

pulmonologist. Dr. Kramer indicated on the form that Duvall was permanently restricted from working in a dusty environment even with a dust mask.

On May 10, 2006, Duvall provided the CRT with a fully completed essential functions form which indicated Duvall could not work in an area with paper dust in the air. Dr. Kramer indicated permanent restrictions for Duvall requiring him to work in clean air. He also noted Duvall could never work in conditions with fumes, mist, gases, and dust. Duvall was told that the CRT was unable to determine a job within the facility that would meet these limitations. Stan McLemore told Duvall that the only job available that would not expose Duvall to paper dust was in shipping but that those jobs had been outsourced "with folks going as of June 1, '06." Duvall was told that all of the palletizer jobs had been assigned based upon seniority and another employee could not be bumped to place Duvall in that job based upon Georgia-Pacific's policy.

Duvall indicated that he would like to return to the shipping department. He was told, however, that even the jobs in shipping did not meet the restrictions of no paper dust imposed by Dr. Kramer and so Duvall could not be placed in shipping as well. Moreover, the shipping department was outsourced in phases. As a Georgia-Pacific employee's job was eliminated, a contractor took over that job. As a result, after Duvall went to work in the

converting department, a contractor filled his job in shipping.

In May of 2006, Stan McLemore, the Safety Manager for Georgia-Pacific, inquired about any open positions in the storeroom. Georgia-Pacific management determined that the employees in the storeroom were being paid at a much higher rate than employees in similar jobs at other companies in the area and that the use of a mix of temporary contractors and Georgia-Pacific employees was not efficient. As Georgia-Pacific employees would retire or leave the company from the storeroom, the positions were filled by employees of the third-party temporary service, Encadria.

In July of 2006, a staffing wage structure was developed for the storeroom. As a part of the new structure, Georgia-Pacific planned to hire new additional storeroom clerks as Georgia-Pacific employees. Wage rates in the storeroom were set under the new wage structure at between $11.00 and $17.00, depending upon experience. Because employees in the storeroom already were making more than the stated wage structure, Georgia-Pacific decided to "grandfather" the wage rate of existing employees. Employees that transferred into the storeroom, however, were to receive the $11.00 per hour rate absent prior experience. The CRT told Duvall that a possible placement opportunity might be presented in the storeroom. However, the CRT also advised Duvall that a doctor would have to sign off on any such placement.

On July 17, 2006, Duvall was provided a Job

7

Requirements/Essential Functions form for his physician to complete in regard to the storeroom job. On July 21, 2006, Dr. Kramer provided a completed form indicating Duvall could perform the storeroom job.

On July 31, 2006, Georgia-Pacific offered Duvall two positions. The first was a temporary palletizer position to fill in for other employees when they were on vacation, sick, or on leave. Although the remainder of the shipping department was to be outsourced, the position offered to Duvall would be a company position instead of a contractor position because it required the operation of Georgia-Pacific equipment. However, it was not a certainty that Duvall would retain the position for any length of time. The palletizer position would also not work a set schedule but rather would fill in as needed.

The second position offered to Duvall was in the storeroom. Georgia-Pacific explained to Duvall that the pay scale for storeroom employees had been reduced. Duvall was informed that new hires and transfers would be making $11.00 per hour in the storeroom. Although Georgia-Pacific believed Duvall lacked some of the skills required for the storeroom job and had no storeroom experience, it agreed to pay Duvall at the top rate under the new scale of $17.00 per hour.

Duvall told Georgia-Pacific he would think about the two options. He then called Georgia-Pacific and stated he would take

the storeroom position. Duvall resumed work on August 8, 2006 in the storeroom at a pay rate of $17.00 per hour. Duvall has not bid on any other positions offered at Georgia-Pacific after his return to work.

Duvall initiated this action for violation of the Americans with Disabilities Act ("ADA") and the Family Medial Leave Act ("FMLA"). However, it is admitted in Duvall's response to Georgia-Pacific's summary judgment motion that the FMLA claim has been abandoned. Therefore, Georgia-Pacific's motion will only be considered in relation to Duvall's ADA claim.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of showing that there is an absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be

taken in the light most favorable to the non-moving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. <u>Posey v. Skyline Corp.</u>, 702 F.2d 102, 105 (7th Cir. 1983).

In this case, in relation to the material facts set forth herein above, there exists no genuine issue, either because the facts were admitted in Duvall's response to the pending motion for summary judgment, or were not contested directly by competent evidence. Accordingly, this Court finds it appropriate to examine whether Georgia-Pacific is entitled to prevail as a matter of law.

Georgia-Pacific asserts summary judgment is appropriate in this case because Duvall cannot establish a *prima facie* case for discrimination under the ADA. Specifically, Georgia-Pacific contends Duvall could not perform the essential functions of the converting job or any other job at the facility save for the shipping department and storeroom. However, in regard to both of these departments, Georgia-Pacific alleges that no Georgia-Pacific or temporary positions were vacant such that Duvall could be reasonably accommodated between May of 2006 and August of 2006, when he began working in the storeroom at a somewhat reduced wage from his prior job in shipping.

Generally, the ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privilege of employment." 42 U.S.C. § 12112(a). In order to prevail on his claim for violation of the ADA, Duvall bears the burden of proof to establish: (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that Georgia-Pacific discriminated against him because of his disability. Davidson v. America Online, Inc., 337 F.3d 1179, 1188 (10th Cir. 2003). The first required element has been satisfied. Georgi-Pacific has not challenged the fact that Duvall's cystic fibrosis has rendered him a disabled person.

The "dispositive summary judgment issue," as Duvall describes it in his response, is in connection to the second element. Georgia-Pacific first contends Duvall could not perform the essential functions of the converting job to which he was transferred from his original employment in the shipping department. Clearly, the presence of paper dust in the environment of the converting job aggravated Duvall's cystic fibrosis and made it impossible for him to continue in that position. The question,

then, becomes whether Georgia-Pacific could provide a reasonable accommodation to Duvall between May of 2006 and August 8, 2006 in either the shipping department or storeroom. Duvall urges that Georgia-Pacific should have considered one of the Encadria temporary jobs in the shipping department or storeroom as a "vacant" position into which he could be reassigned as a reasonable accommodation.

This Court agrees with Duvall's position that a "qualified individual with a disability" does not require that one be able to perform only the essential functions of his then-existing job. The ADA "includes an employee who has the ability to do other jobs within the company that such disabled employee 'desires.'" Smith v. Midland Brake, Inc., 180 F.3d 1154, 1161 (10th Cir. 1999). Thus, while Duvall could not perform the essential functions of the converting job, if he can perform the essential functions of the shipping and storeroom jobs, the inquiry proceeds to whether it is a reasonable accommodation to reassign him to these other jobs.

The ADA specifically recognizes that a "reasonable accommodation" includes "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). To accomplish the mandates of this statute, however, an employer is not required to create a new position, promote the disabled employee, or reassign the disabled employee to an occupied position. White v. York Internat'l Corp., 45 F.3d 357, 362 (10th Cir. 1995). As stated, it is Duvall's position that the

Encadria temporary positions should be considered vacant for purposes of the ADA. This Court declines to follow his line of reasoning.

Given the absence of case authority from the Tenth Circuit Court of Appeals on this specific issue, much of the discussion in the briefing surrounds the interpretation of the case of Dalton v. Subaru-Isuzu Automotive, Inc., 141 F.3d 667 (7th Cir. 1998). In Dalton, the court considered the parameters of the obligation for an employer to reassign a disabled employee. The court first recognized an employer is under no requirement to "bump" an incumbent employee from a position just to accommodate the request of a disabled employee. Id. at 678. An employer also is not required to "abandon its legitimate, non-discriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers." Id.

The court then addressed the status of temporary workers in the ADA accommodation scheme. It reasoned that

> [i]f any of the plaintiffs had been able to point to a particular job that was filled by a temporary worker **while a plaintiff was on disability leave,** and then had been able to show that he or she could have done that job consistently with the relevant qualifications, summary judgment [for the employer] would have been wrong.
>
> Id. at 679-680 (emphasis and bracketed material added by this Court).

This did not end the court's statement on the issue, however. The Seventh Circuit continued in explaining

13

> Even temporary workers do not have to be bumped out of a job, . . ., unless the temporary worker was simply filling in for a particular person during an absence. . . . . Thus, the fact that temporary workers held jobs while the plaintiffs were out of work does not win the day for them.

Id. at 680.

Some district court cases have followed suit in this conclusion, largely relying upon Dalton. *See*, Bennett v. Calabrian Chemicals, Corp., 324 F.Supp.2d 815, 837 (E.D. Tex. 2004); Walsh v. United Conveyer Corp., 222 F.Supp.2d 997, 1005 (N.D. Ill. 2002).

Duvall's position has many practical fallacies. The temporary employees of Encadria were, by definition, not employees of Georgia-Pacific. Therefore, Duvall would have Georgia-Pacific instruct its contractor Encadria to replace the latter's employee. No evidence was presented to indicate a circumstance where, during the transitional period to permanent outsourcing to NLS in the shipping department, a Georgia-Pacific employee was replaced by an Encadria employee and then replaced again with a Georgia-Pacific employee. Moreover, the gradual transitional replacement of Georgia-Pacific workers was, by all accounts, done to permit those workers to bid upon alternative employment within the facility. Duvall's reasoning would prohibit an employer with a disabled employee from ever engaging in such a gradual transition to outsourcing and the drawing down of its employee numbers. The employer would have to abandon such legitimate, non-discriminatory

14

business plans and bolster the number of its employees in addition to requiring the termination of a temporary worker in order to accommodate the disabled employee. This does not represent a reasonable accommodation under the circumstances.

Similarly, Duvall's theory of accommodation would preclude an employer from evaluating a business plan as was instituted in the storeroom by Georgia-Pacific. While it was considering whether to outsource its storeroom functions, Georgia-Pacific replaced workers leaving the company by attrition with temporary Encadria employees. This plan was intended to keep the number of disrupted Georgia-Pacific employees to a minimum in the event outsourcing was instituted. Shortly after the outsourcing plan for the storeroom was abandoned and a new wage structure was imposed, Duvall was offered a job with the storeroom as one option for employment accommodation available to him, given his medical restrictions. This reasonable business activity cannot be viewed as a failure to accommodate. Indeed, to disrupt such plans, if formulated legitimately and without discriminatory intent, would result in precisely the type of undue burden upon the employer which the ADA specifically states its provisions are designed to avoid.

Duvall allegedly finds safe harbor in his position in the language authored by Justice Sandra Day O'Connor in the case of U.S. Airways, Inc. v. Barnett, 535 U.S. 391 (2002). Justice O'Connor defined a "vacant" position, citing to *Webster's Third*

*International Dictionary*, as "not filled or occupied by an incumbent or possessor." Id. at 409. She then translated this definition to the workplace in defining a "vacant position" as "a position in which no employee currently works and to which no individual has a legal entitlement." Id. The application of this language to the case at bar is limited by the factual differences in this case and U. S. Airways. The Supreme Court case did not involve the displacement of a temporary, contract worker. Duvall apparently interprets the language by Justice O'Connor as meaning the position is not occupied by an employee of Georgia-Pacific. Nothing in U. S. Airways leads one to this interpretation. The position is occupied by a contract employee Encadria and Duvall's proposed accommodation would require the removal of that employee. The legal entitlement to the position is established by contract. Therefore, what little applicability U. S. Airways bears upon the circumstances and ruling of this case does not weigh in Duvall's favor.

Because this ruling is dispositive of Duvall's claims, this Court will not address the somewhat implied but not fully developed argument that Duvall could not perform the essential functions of the shipping department job. To the extent Duvall also claims Georgia-Pacific violated his rights under the ADA through the wage restructuring in the storeroom, this Court finds no merit in the claim. Duvall had no work experience in the storeroom and a

question existed as to whether he had the skills necessary to perform the job. Yet, Duvall was paid in the storeroom at the highest level of the new pay scale. Additionally, those storeroom employees whose salaries were grandfathered into the new wage scale had substantially more experience in the storeroom than Duvall.

Nothing in the record indicates Duvall's established wage rate was motivated by his disability. In order to comply with the mandates of the ADA, an employer should first consider lateral moves to positions that are regarded as equivalent. An employer then may consider lesser jobs that constitute a demotion if no such equivalent positions are available. Smith, 180 F.3d at 1177 citing Cassidy v. Detroit Edison Co., 138 F.3d 629, 634 (6th Cir. 1998)("[a]n employer may reassign an employee to a lower grade and paid position if the employee cannot be accommodated in the current position and a comparable position is not available.")

The evidence indicates the CRT assembled to address Duvall's limitations diligently sought alternative jobs within the company to which Duvall could be reassigned. No such jobs were available without displacing an existing worker until Duvall chose the reassignment to the storeroom. Georgia-Pacific was under no additional obligation to accommodate Duvall's disability for the approximately three month period identified by Duvall.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment filed August 1, 2008 (Docket Entry #42) is hereby **GRANTED**.

Accordingly, Duvall's claims asserted in this action are hereby **DISMISSED**.

IT IS FURTHER ORDERED that the jury trial of this case currently set for September 22, 2008 is hereby **STRICKEN**.

IT IS SO ORDERED this 17th day of September, 2008.

_____
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE